1-4-6-5-0-5 Mitchell Willoughby v. Thomas Simpson Arguments not to exceed 15-30 minutes per side. Mr. Burke for the appellant. May it please the court, Dennis Burke and Jim Blake on behalf of Mitchell Willoughby. And if I could request seven minutes for rebuttal. That is fine. Thank you. I'm going to limit my or focus my argument today on the Eighth Amendment claim, which is the second claim in my brief. And specifically that is that the prosecutor in this in the trial conveyed inaccurate and misleading information to the jurors that diminished their sense of responsibility in these proceedings as jurors. That was, well, it was both contrary to Kentucky law, but it was also, as I said, misleading. It wasn't contrary to Kentucky law because the Kentucky Supreme Court held, in their opinion, that it was consistent with Kentucky law. Did they not? No, Your Honor. They rejected the argument. They did reject the argument. Didn't they hold it did not violate Kentucky law? Well, they did. Okay, so it doesn't violate Kentucky law since the Kentucky Supreme Court has so held. And we, as Sixth Circuit judges, apply state law as interpreted by the highest court of the state, which the Kentucky Supreme Court did in this case. I understand. Well, no, not, not, no. No, not in this case. No, not, not the way you're saying it. So let me clarify what the Kentucky Supreme Court said, in fact, in Willoughby, which is this case here. Yes, our case. Yes, is that under Kentucky law, the jury instructs, or rather the word recommend that's in the statute in no way diminishes the responsibility of the jurors in deciding the sentence for the defendant. That's what they said in Willoughby. And that is the Kentucky law. It's the same argument you're making to us, is it not? No. No? No, Your Honor. My argument to you is that the Kentucky Supreme Court, who were aware, who acknowledged that was the law, that they misapplied Caldwell v. Mississippi to the facts of that trial. Okay, I thought you told me that Kentucky law was misapplied in this case. No. I thought that's how you started out. I apologize if I did say that. I wanted to correct you. I said, no, Kentucky law was not misapplied. In fact, Sure. The Kentucky Supreme Court said they applied it correctly. Right. And, of course, it's a federal habeas. So the whole point is we're talking about constitutional law. And so let's talk about what You say that the comments by the prosecutor diminished the role required by Kentucky law. That is correct. But the Kentucky Supreme Court said they did not. That's correct. But what I think is important to note is that what the Kentucky Supreme Court did is they, folks, in fact, they described it as a counting game. That it was a counting game of the word recommend. Even though they acknowledged that there was, there were, the argument on direct appeal to them involved both the voir dire and the closing argument, as well as the jury instructions. They considered it a counting game. And they said, in fact, it's not a counting game. And, of course, it's not a game because Mitchell Willoughby is sitting on death row as we speak. But what they did not acknowledge or touch upon is the fact that not only was there a drumbeat, if you will, of the word recommend throughout the jury instructions and in the closing argument and in the voir dire, is that the prosecutor also misstated the law directly. And that is important. And let me just back up a little bit and talk about what is the law in Kentucky. And the law is under both Kentucky Criminal Rule 5A4, as well as Supreme Court precedent. It says that the jury is the one who is responsible for fixing the penalty. And specifically for capital cases, that the jury is required to decide whether or not a defendant should be executed. And that regardless of the statute that talks about recommendation, of the recommendation to the judge, regardless of that, that the prosecutor or no person during that trial is allowed to either directly or indirectly diminish the juror's sense of responsibility, their sense of duty of what they have to do in the penalty phase of the trial. And that's exactly what happened here. That throughout, from both the individual voir dire and in the closing argument, there were both references to recommend, which I'll get to in a moment is important, but also actually saying directly that you do not set the penalty. You recommend to the judge and the judge sets the penalty, which is not the case. And what it managed to do... Okay. Who sentences if the judge doesn't do the sentence? What the Kentucky Supreme Court has made clear, Your Honor, is that regardless of the fact that it can go up on where the judge can consider and actually do the final sentencing, regardless of that... The judge does do the final sentencing. Correct. He does. Or she does. That's correct. But regardless of that, what the Kentucky law has, what the Supreme Court has said over and over and over again explicitly is that cannot, that fact cannot be used to diminish the jury's responsibility, because it is the jury's responsibility to set, to decide whether to sentence someone to death. Because here's the thing. If the jury decides that they're not going to sentence someone to death, the judge can't do it either. I know. It's a condition precedent. Right. And so... Okay, but, I mean, just say the obvious. The judge, to the judge's ultimate decision to sentence to death, as a condition precedent, the jury has to recommend... No, no, no, no, no. That's not true. The judge has discretion, does he not? He does not have to... The judge has discretion, but as the Kentucky Supreme Court pointed out, the reason why it's important not to mislead the jurors in that way is because it's rarely, if ever, has a judge, and I personally have not been able to find a single case, and perhaps you can, where... You said no to my question. What was no about it? They don't recommend, they do not recommend to the judge. Actually, Kentucky statute uses... That's correct, and that's exactly my point, is that the Kentucky Supreme Court judge, and I will say, I can, well, it's in the brief, but certainly if you read the Kentucky Supreme Court's opinion in Ward v. Commonwealth, in, well, in Willoughby itself... What word would you have them use rather than recommend? I would have them use the word fix, because that's what the law is. Sure, and Kentucky Supreme Court said, after this case, we're tired of all of these challenges here, so we're going to make sure it doesn't happen again, so we're going to change recommend to fix. That's right. But that wasn't the law at the time. No, no, no. The law, Your Honor, the law was that you cannot mislead the jury into making them think that they, regardless... The statute said recommend. The statute said recommend, but what the Kentucky... That's not law. Not for purposes of this, no. No. Okay. Because, let's think about this, it's much like Caldwell. Caldwell, the prosecutor said that you have, there's an automatic right to an appeal by statute, which is absolutely true. But regardless of that, the United States Supreme Court found that it violated the Eighth Amendment, that the sentence was rendered to be unreliable, the risk was too great that it was arbitrary and capricious, because the jury did not understand what that really meant. And so, in this case, the jury was never told that you can, the judge has the power to do that, but it almost never has happened, if at all, has happened. They also weren't told that you were the ones that decide and... What does the judge have that almost never happens? What is that? The judge has the authority to reduce it from the death sentence to a, whatever, life without, presumably, or life without for 25 or life. You said it could happen, but doesn't happen? That's correct. What are the statistics on that? Do you have them? To my knowledge, it's never been done. Okay. Does that top your head, or do you actually have... I have not been able to find a case, Your Honor, and I would point the court to... Hard for me to believe that, but... Well, and I would point the court to the opinion in Ward, where they told the prosecutor... You actually don't know. I mean, you're trying to testify in front of us. I can tell you definitively... The judges never do it, but you don't know what you're talking about. Well, I beg to differ with that, but I will tell you this. Give me some facts and figures. I don't want to go off the top of your head. I will say to you this, that it rarely, if ever, happens, and I can say that. And I would point you to the... Okay. Cite me some statistics that I can look up. I will cite you to the... Something that's solid... How about this? I'll cite you to the... ...rather than your impressions. It's not my impression. It's the Kentucky Supreme Court's impression. All right. I would ask you to read the concurring opinion of Ward v. Commonwealth, and that's cited in my brief. Okay. I do have a question. Yes, sir. We have a decision from back in the early 90s, this Corden-Brock v. Scroggie. Yes. Are you familiar with it? I am. It's a Caldwell case. It is. And there we said, en banc, that the prosecutor's comments that a jury's recommendation of death was not binding on the court did not violate Caldwell. How does that decision, if you agree with my quick summary of it, how does that decision square with the claim you have today? Well, there are a couple of things. The thing with Corden-Brock is that what the court had found, and this court agreed with that, but the Kentucky Supreme Court had found that most of the things that were said that were complained of by the prosecutor had actually been done outside the hearing of the jury. And so what the Kentucky Supreme Court said is, look, you're right, that is the law, that they're not allowed to diminish the duty of the jurors. Just like they said in Willoughby, that is absolutely the law, and there's no dispute about that being the law. But based on those facts, they found, and I think they said it's a close call, but based on those facts, they did not find that it was a Caldwell violation. In contrast to that, we have in this particular case where those statements, those misstatements about the responsibilities of the jurors was not outside the presence of the jurors. It was said to them in individual voir dire, and it was also said to them in the closing argument. So in the individual voir dire, there was one juror who actually expressed that she was in favor of the death penalty, but she didn't want to have to do it herself. And shortly thereafter, the prosecutor assured her that your duty as a juror is to recommend it is not to fix the penalty. And again, the problem is that is false. It is false and it is misleading, and it reduced the jurors, in the jurors' mind, their sense of responsibility, because their responsibility absolutely is to fix the penalty, again, because the Kentucky Supreme Court has said so. And that wasn't the only time. There were at least three different jurors where the prosecutor said similar things. In one, in fact, he pointed out that, look, you went to a jury orientation, and you were told that the jury fixes the penalty. Well, this is a capital case. In this capital case, you don't have to do that. You recommend, and the jury decides. There was yet another juror who actually expressed when asked that her understanding was, could she do it? Well, she wouldn't have to. She would only have to recommend. So the idea that the jurors were misled by the Commonwealth in this case is not really in question. And beyond that, there are other reasons why it's misleading. So the Kentucky Supreme Court talked about how this is not a counting exercise, a counting game, of how many times the word recommend was said. And yet what's important to think about is in the closing argument of this trial, when the prosecutor told the jurors that they do not set the penalty, or the sentence that the judge does, he referenced the jury instructions. He pointed them to the jury instructions, the recommend in the jury instructions, and then said, you don't fix the penalty or set the penalty. So here we are bringing all of those jury instructions. Forty-some odd times, they were told, you recommend. So you had them at the very beginning with the individual voir dire. You had them at the closing argument. And you had them throughout the jury instructions being told that your responsibility is not to sentence the defendant to death. And in reality, that is exactly what their obligation was to do. Because if they didn't do it, if each individual one of those jurors did not vote for death, regardless of what the judge said, that person, Mitchell Willoughby, could not be sentenced to death. And they didn't know that. They were not told that. Not one time throughout that trial, not one time did the judge tell them, wait a second, that's not the law. This whole recommend you don't set the penalty. Not once did the judge say that. And by the way, in Ward v. Commonwealth, the judge, the Kentucky Supreme Court said, if that happens, the trial court's obligation is to immediately stop and inform the jury the actual state of the law. Well, that never happened. It never happened by the judge. It never happened by, certainly didn't happen by the prosecutor. And it didn't happen by defense counsel. Now, was there a couple of references to the fact that you set the penalty? Yes, there were. But was it ever clarified or explained to the court that you fix the penalty and that you don't recommend the penalty? There was not. There was not, which of course is part of the problem. There was not. Again, Your Honor, that's part of the problem. If there had been... Is there a claim of ineffective assistance of counsel before? There isn't and there doesn't have to be because it was decided on the merits by the Kentucky Supreme Court because, again, this is a capital case and heightened review is necessary to make sure that mistakes aren't made. So the Kentucky Supreme Court considered whether or not it was decided. They decided it. Rather, it was objected to. They considered it on the merits. And the problem, what happened with the Kentucky Supreme Court is they unreasonably applied Caldwell, not their own law. They unreasonably applied Caldwell because in reviewing that, they failed to consider the fact that the jurors, and you'll note if you read the opinion, nowhere in there they talk about the jurors being told, you do not set the penalty. And again, there were at least three jurors who were told that individually. There was no mention of that. So the idea that this isn't about what the law is. We know what the law is in Kentucky. What happened here is that the Kentucky Supreme Court simply unreasonably applied Caldwell v. Mississippi to the trial that occurred in Kentucky. I think it's important also to point out yet another factor that was misleading here for the jurors, and that is this. As I talked about, it said recommend, recommend, recommend throughout in the penalty phase. But it didn't say that at the guilt-innocence phase. It actually told the jurors, if you find the defendant, Mitchell Willoughby, guilty of manslaughter, then you shall fix the penalty. But if you find him guilty of murder, you shall not fix the penalty. And then from there, never mention fix again. It was recommend, recommend, recommend. And on top of that, the prosecutor telling jurors explicitly, you do not set the penalty. You only recommend, which allowed them to, at least one of whom didn't want to sentence this person to death, allowed that juror to think, I'm only recommending. I don't have to worry about sentencing to death. And as far as going back to Caldwell, that's exactly what Justice O'Connor, in her concurring opinion, talked about, that the danger of allowing this to happen is that jurors are laypersons. So a juror who's a layperson understands what recommend means. A juror knows that recommend means, for example, that if I take my child to the doctor and the doctor tells me, recommends surgery for that child, that the doctor isn't the one making that decision. I'm the one that's making that decision. And so the jurors, they would have known that if they had been told, you make the decision. But they were not. They were misled by the prosecution, which is contrary to what this Supreme Court has demanded of the Eighth Amendment and of prosecutors in order to make sure that we don't have arbitrary or capricious death sentences, that it is simply not permitted. And that's what happened in this case, and the Kentucky Supreme Court's ruling to the contrary is clearly unreasonable. If I don't have any other questions, then I'll... Well, I know you didn't plan on addressing it, but in your briefs you argue that there would be cause and prejudice to overcome the procedural default regarding the Sixth and Fourteenth Amendment claims as to extraneous evidence. Yes, Your Honor. Purportedly brought into the jury room and used by one of the jurors, you say, improperly. Right. Do you want to address that at all? I found that to be an argument worth talking about. Well, it is worth talking about. The problem that we have in this is that it needed to have a hearing to determine exactly why. We know that the jurors were questioned. We know that the defense counsel, post-conviction counsel, made an effort to investigate the case for purposes of the post-conviction, for example, for purposes of determining what may have been ineffective decisions, what wasn't done that should have been done, which is usually the purpose of post-conviction. So we know that those questions were asked. We don't know the details of what happened in those questions, I'm sorry, in those interviews. So we don't know at all whether or not the judge, I'm sorry, that the attorneys failed to do something in their... What would be the basis for sending this back to the district court for an evidentiary hearing or just a remand? Well, it would be for two parts. I mean, ignoring the fact that they would have to be hearing for the purposes of the actual extraneous information that was in the jury room. But as far as for purposes of the procedural default, it would be to find out what happened in those, what process, what did the post-conviction counsel do to prepare such that they didn't... Was it beyond their control to learn this or not? And we don't know the answer to that. All we know is that... Is there some ability of the Kentucky court or some basis in law for the Kentucky court to have forced those jurors to come back and testify in any event? Well, if there's a claim that there was extraneous information that was brought into the jury room, then... What's the Kentucky law about jurors testifying in attack on a verdict? Well, they can't attack the verdict directly under those circumstances and say, well, so what were you thinking about? But if there's something extraneous that comes into the jury room, so for example, if the jurors brought newspapers in and were reading newspapers, or in this case, if they brought the Bible into the jury room and they were talking about the Bible, and this is why we know that it's okay for us to sentence the... I don't quite understand the Bible argument. You're saying your client was prejudiced because they had a Bible during deliberations. Well, the first commandment in the Bible is thou shall not kill. I would think the Bible would have gone to your benefit in a death case rather than a detriment. Well, except that we know that that's not... I mean, there's a lot more in the Bible than just thou shall not kill. Isn't that the first commandment? I mean, that's God's first commandment. Well, sure, but... And if they're unduly influenced by the Bible, why wouldn't the inference be that they're going to not impose? You say because they had a Bible, your client's prejudiced, but I'm thinking probably the more logical inference is that he's probably helped. I mean, why should we assume prejudice? That raises an excellent point, and that is why, of course, we would need an evidentiary hearing. This is 26 years after the trial. You really think we could have a hearing together 26 years later and say, now, what did you guys do 26 years ago? Is that realistic? I mean, a lot of jurors probably aren't even alive. Except that that's not my client's fault, Your Honor. I mean, he asked for their hearing. Is it realistic for us to convene an evidentiary hearing 26 years later to try to find out what happened in the jury room? I'll say this. Is it realistic? It is certainly the better alternative than to throwing up our hands and saying, well, now we should execute Mitchell-Willoughby. I mean, if the alternative is to do nothing, then yes, that is the approach to take. I wanted to go back to what, because I think maybe I am misapprehending what Kentucky required along these lines, at least back then. But my understanding was that the Kentucky rules said a juror cannot be examined to establish a ground for a new trial except to establish that the verdict was made by lot and also that the law precludes consideration of an affidavit of a juror that jurors had considered matters not in evidence during their deliberations. And that seems to me to be kind of preclusive here. It does. In fact, that rule still exists. Why doesn't it apply here? Because the Kentucky Supreme Court has interpreted it saying that's not what we mean. We mean that you cannot challenge the verdict. So you can't go in and challenge what the jurors were talking about amongst themselves based on all of the evidence. But you can challenge things that are done that either came from outside or, for example, you could have if there was a bailiff, for example, who was talking to the jurors and telling them what they should decide or telling them what he knows about the case, then that would be something that the court would look into. But if it was just about saying there was a juror in there and the juror wouldn't participate in the jury deliberations and so therefore it wasn't a unanimous verdict, then that's the type of thing that the court said no, we're not looking into that. It's only if it's something that's from the outside, that's external, that will allow a court to inquire into what happened. One further question on this whole line. Inasmuch as the state courts said they denied this claim, they ruled against you on the basis that it was defaulted because it wasn't brought up for such a long time. What are you looking at as cause to get around that default? The cause, Your Honor, is that they had attempted to talk to the jurors and that those that they had talked to, most of them wouldn't talk at all. And the few that they did talk to, they were unable to learn that information from them. Despite the questions they asked, they didn't share that information. But doesn't cause in this situation under Murray v. Carrier have to be something that the state has done? These are individual jurors who said I don't have to talk to you and furthermore, I'm not going to. Yes, but it's much like in this particular case, this was something that, so it was outside, we know that it was outside the control of defense counsel. And for purposes of this, this state action, this trial that sentenced Mitchell Willoughby to death was a state action. Of course it was, but it wasn't the state who said to the jurors, don't talk. Sure, but again, it's much like for purposes of ineffective assistance of counsel. Defense counsel is not part of the state. And yet, when there is an ineffective assistance of counsel, it's considered that the state is responsible because it deprived the defendant of effective assistance. In this case, the defendant was deprived of a jury that decided his fate, the verdict and sentence, based only upon the evidence that was introduced at trial. So, I mean, that's why if, you know, as long as the defense counsel or the post-conviction counsel were doing what they were being diligent and it wasn't something that they controlled, then in fact it would be, it should be cause. Okay. Your initial time has expired. You'll have your full rebuttal. Thank you. Good afternoon. May it please the court, Mr. Burt. Counsel, before you address those two points, those two issues, I don't have a lot of concern about those two issues. But I do as to the third issue. The prosecutor at the penalty phase, to me, appeared to go way over the top, arguing matters that had nothing to do with the crime or necessarily the defendant in asking the jury to impose the death sentence. And, I mean, the prosecutor argued that if he's not sentenced to death, that he could assault other inmates with a knife in the prison, that perhaps he could escape and be a danger to community and commit other murders, and that the innocents, citizens, our community, are going to be at risk. Anyway, I'm from Michigan where we don't have the death sentence. And as a state judge, I didn't have to review what's proper and what's improper at the penalty phase. But in the guilt phase, you've got to limit your arguments to the facts of the case and to the defendant. And you can't make inflammatory arguments to go to the passions of the juror members to try to get your ultimate result. And here, did not the prosecutor go too far in some of these comments? And if not, why is that not reversible? Well, the Kentucky Supreme Court found that they didn't, and the U.S. District Court agreed. Based off of the overall fairness, you have to look at whether the comments were so inflammatory that they infected the trial with unfairness such that the jurors couldn't consider mitigating evidence. In this particular case, the jury verdicts alone discount that argument or that concern because they... Evidence is so overwhelming, is that it? Well, evidence of guilt is so overwhelming. The defense counsel in this case, Joe Jarrell, his strategy was to admit guilt and rely on mitigation. He infused the guilt phase with mitigation. He had a mitigation case in the sentencing phase. He spoke to a myriad of reasons why he wanted this jury to spare Mitchell Willoughby's life when they were deciding the sentence. As you focus through those particular issues, one of the real, I guess, main points was that Joe Norman, I wouldn't say the primary victim, but one of the victims, the reason that Mitchell Willoughby and Lee Palverson were in that house to begin with was because Mitchell Willoughby and Joe Norman worked together remodeling homes. Mitchell felt like Joe was a bully to him. He claimed that he owed him some money related to an injury he'd had. They were there to talk to Joe Norman. Joey Durham and Jacqueline Green, the other two victims, unfortunately just happened to be in the wrong place at the wrong time. Nevertheless, Mitchell Willoughby claimed that Joe bullied him, that he threatened him with a bayonet. He testified in the guilt phase and said all this. Based on all that, it was self-defense. Of course, the evidence also flushed out that Mitchell Willoughby fired fatal shots into all three victims, and even though Jacqueline Green also had fatal shots that were traced back to Lee Palverson's gun, she didn't die instantly and she was on the ground moving. Mitchell Willoughby went over and shot her twice, once in the back of the head. You've got overwhelming evidence of guilt. You've got pretty horrific crimes. He tries to conceal them. He's, in a sense, just based off of all the circumstances, sort of the main actor in a way. Not entirely, but in any event, all of those things create this overwhelming sense of guilt to where you look at, okay, now we're going to get to penalty, and then the jury comes back and it's a life sentence for Joe Norman's murder, but it's a death sentence for the two innocent bystanders. So the jury was able to look at all that mitigating evidence and was able to decide, we're going to base this penalty off of these particular instances with each murder. So the idea that they weren't able to consider mitigators doesn't fly, because they did, and they gave him a lesser sentence for that reason. I would also note that our brief was filed on May 17, 2018, and approximately three weeks later, I appeared before this court and three different judge panels and argued the Leif Halvorsen case. That particular argument, I think it was about two weeks later that Mr. Burke filed the reply brief in this case. So briefing had finished on August 20, 2018. A different panel of this court unanimously decided against Leif Halvorsen. They affirmed the denial of his federal habeas unanimously with regard to this particular issue as well as the first issue with regard to Germ's conduct. And there is law in this circuit that that's now law of the case, or at least law of the circuit. Far be it from me to tell judges what they can and can't do. I don't want to do that. But in any event, those are out there and those opinions address these very same issues that you're bringing up today. And in my opinion, they correctly address them. I will say that if the merits of the impartial jury misconduct issue are dealt with, Judge Batchelor, you're correct in that there wasn't any impediment from the state and that's required here in order to get past the cause component. I don't think there's a prejudice component either because of a lot of the stuff we've already talked about. But nevertheless, the trial happens in 1983. In 1985, Mitchell Willoughby was given permission to interview jurors. Two of the jurors agreed to talk. As you said, the jurors have a right not to talk, but two of them did. And they were on notice that religion was an issue in this case. But were they on notice that one juror may have actually recited passages of the Bible, things that are in the gentry affidavit? They knew that Pastor Garlington was religious. I think they were on notice that they should have gotten into those issues. If they didn't, that's for whatever reason. I don't know why. But yes, because of what was talked to during Individual v. Dyer, they specifically talked to him about the fact that he was a pastor. He quoted scripture during that process. At the end of the case, the astonishing fact was the quotation from the appellate courts that he led the court in a prayer when they finished. And then, as I pointed out, and it's been one of my sticking points all along, both defense attorneys knew he was a pastor. As you read their closing arguments in the sentencing phase, you start to wonder if I'm reading a transcript from a church proceeding or if it's from a court proceeding. They are appealing to him. He is the main focus. They talk about their own Christian backgrounds. They talk about the Bible in general. They bring up Old Testament. They bring up New Testament. They bring up other religions. They throw everything against the wall here to see if something will stick to try and save these two gentlemen. So, I don't think they can say that they weren't on notice, that they should have asked some questions about the role of religion here. The pastor had indicated in voir dire, as I recall, that he could decide the case based upon the facts and the record, and of course, lots of jurors are religious. Correct. And jurors who take Bibles back into the deliberation, the jury room. But the question is really, I guess what I'm asking you and I guess you've answered it, is it reasonably available, would it have been reasonably available in 1985 for Mr. Willoughby's attorneys to have gone that far to ask these jurors whether the pastor cited passages of the Bible or used the Bible as arguably a tool to influence the jury's verdict? Right, and I think so because they asked about it in 2003. Nothing changed. In 1985, they were able to interview two jurors. They were given permission a second time in 88 and they attempted to interview seven jurors, but they all declined. And then again in 2003, and as I pointed out in my brief in violation of the law, they were given a third crack at this. So, nothing from the state. There was no impediment that could possibly establish cause where they were impeded from getting to that point. And given all that they knew about Reverend Garlington, I think it should have been something they asked then rather than waiting until 20 years later. And now at 36 years later. And certainly nothing establishing prejudice. You guys are focused on cause, but I think prejudice is the harder hurdle to get over. How is it prejudicial that you reference the Bible? How is it prejudicial that you pray? Yeah, the jurors are allowed to come into the jury room with their life experiences. And certainly there are a number of cases in my brief where courts have found no issue with a Bible or Bible verses being in some cases even utilized to an extent where none of that even happened here. And really the gentry affidavit is significant as much for what it doesn't say as what it does say. Juror Gish, who they spoke to, she never says anything about a Bible. She says he led them in a morning prayer. And then his reference to his Bible only refers to the fact that they had a morning prayer that he felt was a way to comfort the other jurors from the fact they were away from their families. I think she refers to Pastor Garlington as pro-death. She does. She does say that. The two comments you get from her is that he led the jury in a morning prayer and that he was pro-death. What does that mean? He voted for the death penalty? Does it mean he was pro-death going into the case? And I argued that, if not in my brief, definitely. They all arguably are pro-death. They all voted for the death penalty. Maybe he was one of the first. Right. And again, even saying that doesn't indicate that that means he used the Bible to get to that point. As I said, I think the Bible is against the death. Right. Is there any evidence, any place in this record that would serve as a basis to assume that whatever may have been quoted from the Bible and whatever the pastor's prayers were, that they were prayers encouraging the jurors to vote for the death penalty? And is there anything, second half of the question, is there anything in this record from which we could even speculate that somehow the prosecution was responsible for discouraging the ability of the defense to find out the answers to those questions? I'll answer the second one first because it's easier. No, I mean, I don't specifically recall how, or the mechanisms that ended up getting them the two prior attempts at the interviews in the 80s. But certainly in 2003, it's a convoluted story how they get there. They ask a separate trial judge that wasn't even hearing these cases what her opinion was on a new Supreme Court case that had come out from the Kentucky Supreme Court. And off that ex parte communication, they believe they have justification to just go out and start talking to him again, and they do. And that's where all of this comes from. But as far as the prosecution, we weren't even involved in that part of the case, or that particular set of circumstances that led to the 2003 interview. I don't recall if there was any attempt to stop the 1988 or the 1985 interviews. I don't believe there was with 85, but I'm not positive. But in any event, they happened. The judge certainly allowed them in both those circumstances. As to anything in the record... I apologize, I forgot the very first part of your question. I know it has to do with the record. I'm trying to figure out where in the record we could look to see whether there's any indication that the two jurors who did talk felt as if the pastor was encouraging them to impose the death penalty. I know the one juror said that he was pro-death, but I didn't think she said that in the context of and he was praying that we were going to impose the death penalty. Right. No, Juror Garlington specifically said that the two that spoke, he was one of them. The second one, the only comments with regard to her is that he was pro-death and that he led them in prayer every day. His explanation for the prayers and having his Bible, it's his personal Bible, he carries it with him, and that he leads them in a morning prayer to comfort them. There was some argument from Willoughby's attorneys that he specifically referred to three psalms that he said he recalls reading. 20 some odd years later, he said he recalled reading those three psalms. And again, I don't know anything about Juror Garlington other than he was 72 at the time of this interview. But they argued, well, you can look into those passages and you could find something that sort of hints that he wants to get a death verdict. And I argued the opposite. It's completely vague, it's completely difficult to find something in there that you can definitively say, oh, he's trying to push buttons here. Again, he wasn't the foreman. Mr. Willoughby's attorneys at certain points have tried to make him appear to be this imposing figure who had some kind of sway over the jury. And I think that's what maybe his defense attorneys were hoping based off their closing arguments. But again, he wasn't the foreperson. They didn't have a death verdict with respect to Joe Norman. So other than those three passages, there's no information other than, I would argue, because he's comforting jurors. I can't imagine that a comfort to them would be, let's give this guy the death penalty. Here's a passage that supports that. That doesn't seem very comforting to me. Lastly, with regard to the Caldwell v. Mississippi violation, my take is completely different on that. As the district court noted in this case, the Kentucky Supreme Court went into great detail about this issue. They examined the voir dire of all the individual jurors and they did want to make a point that it was an accounting game because if you've got these eight instances, well, it's individual voir dire. This one person is hearing this term one time. It's not the entire group hearing it over and over and over. When you get to the closing argument, yes, it is the entire group. But again, for the very same reason that Mr. Burke is arguing that they should have used a different term, well, eventually they did decide to use a different term because this issue kept coming up. Caldwell comes out in 1985 and then the cases just start coming. That's common in appellate practice. A Supreme Court case comes out and then everybody starts to use that case to try to use it to their advantage. But in terms of, we have a statute that says recommend. The instructions are going to say recommend. As a prosecutor, what else can you do in that instance other than use that term? If they had used fix, fix, fix up until that point and then the jury gets back there and sees the term recommend, I think that would have caused more problems than if he hadn't used that term. So I think there's a really good reason that he needed to use that. He did, and he did it in a way where he didn't qualify it. There's no merely or only or just. He refers to the fact that they're recommending a punishment. But if you look at that 38-page argument and the arguments from defense counsel, who also use the same term, they are going as far as they can, in your estimation, maybe too far at one point or another, to try to get this jury to give or not give the death penalty. If they're just recommending something, then why would the attorneys go to that length? They were impressing upon that jury that this was their decision. They understood it was their decision. They had to have that information that it was a recommendation because the instruction was going to say that. But that was the law at that time. In Grooms, three years later, 1988, the Kentucky Supreme Court finally decides, okay, enough of this. It's say fix here, say fix in the instructions, and let's be done with this. Do you have any judges in Kentucky that are personally against the death penalty and are reluctant to impose it? I find it incredible if you don't. Do they have the discretion to accept the jury's recommendation of death or not? I can give you a lot of judges in Michigan that would say I'm going to exercise my discretion for a lot of reasons. No, I think that's… But evidently the other defense counsel says, oh, it's automatic in Kentucky. Well, I can't specifically name a case that will go exactly to your point, but as far as, ironically, the same judge that told the Department of Public Advocacy that they could go interview jurors was Judge Mary Noble at the time. She became a justice on the Kentucky Supreme Court and when the only execution that Kentuckys had since I've been a part of the Attorney General's Office was a volunteer in 2007, Marco Chapman, and in that case, when they issued an order late that evening that they were going to allow this thing to go on, it was with a caveat where Justice Noble noted she was against the death penalty, but to the extent that she has to impose the law, it goes forward. So, yes, there are judges that are against the death penalty. Absolutely. Anyway, at least theoretically a judge has the discretion not to impose the death penalty. Despite the jury's recommendation or fixing, is it called fixing of the sentence? Fixing, that's an odd word too. Recommend seems more precise to me. The only other point I guess I would make with regard to the recommendation issue is also just looking at it through the prism of federal habeas review, the deference that goes along with that. The Kentucky Supreme Court identified the correct case. They identified the correct standard. They noted that it was in line with not only Kentucky law, but also the Supreme Court of the United States law, and they didn't feel like the use of the term recommend in that instance was a problem. I would assert that it would be very difficult to say that that's an unreasonable application of US Supreme Court precedent. With that, I will take a seat. Thank you all very much. I just have a few comments. What the Assistant Attorney General told you is that the Kentucky Supreme Court did a very careful review of the record, and I would hope they would, except the problem with that is, and I would ask you to read the trial and to compare it to the case law in Kentucky that tells the jury or tells us what the responsibilities are of the jury and then apply that to Caldwell v. Mississippi. I think if you do that, you will find that in fact there are numerous instances where the prosecutor misled the jury. If I could back up just a second. We pointed out in our brief there was a great deal of not once in the opinion does it cite anywhere where the prosecutor said you don't set the penalty, you only recommend it, and yet they did three times, minimum. That's just in the individual video. I would ask you to read the trial because that is what is suggesting later on the Attorney General said or Assistant Attorney General said that the prosecutor didn't qualify his comments at all when he talked about recommend, he didn't say simply recommend. Well, first of all, one, that isn't true and that's footnoted in our brief. He actually did say for one of those, you simply recommend, but that's not even half of it because he went far, far beyond that. What he actually said was, again, you don't set it at all. He didn't say just you simply recommend and inference that they don't decide. He told them explicitly, you don't decide. So I want to just touch on one in that vein also. In the closing argument, the prosecutor actually was aware probably because there was a juror who said I don't want to have to execute someone myself and so then he said, well, don't worry, you don't have to and I'm slightly paraphrasing. But he says, and I quote, probably none of you have ever before had to make the real life decision of whether a particular criminal should receive the death penalty and most people would be far more comfortable to let someone else do it than to have that responsibility. And that's at 2529 of the transcript. So at 2529, he tells that jury, I understand most people do not want to have that responsibility of sentencing someone to death and so he remedies that concern, that problem at page 2537. In these instructions, it's very clear that your recommendation, your verdict is a recommendation to Judge Angelucci and you don't have to set the sentence in this case. You recommend it. So he sees the problem, the concern that maybe there are jurors who don't want to sentence someone to death that they're solely responsible for deciding and so he misleads them. He tells them specifically that's not your job, that that's Judge Angelucci's responsibility and that was not only false but misleading, which is absolutely what Caldwell, what the United States Supreme Court talks about in Caldwell v. Mississippi. So when we say that the Kentucky Supreme Court didn't misapply Caldwell or unreasonably apply Caldwell I think the only way we can reach that decision is if we ignore reality. If we ignore what is actually in the trial. Because if you read the trial and you compare Kentucky law and then you apply Caldwell you will find what any reasonable all reasonable jurors would find is that indeed the Kentucky Supreme Court unreasonably applied Caldwell to the trial in this case. And it is not as if this is the first time that a court has had to reverse a jury trial or a conviction or a death sentence rather because the prosecutor even before TAMI when they couldn't say recommend it numerous times the Kentucky Supreme Court in fact did it where the prosecutor went too far. This is one of those cases. So again, please read the trial, compare it to what happened in Caldwell and I think you'll find not only is it in violation of Caldwell but what the prosecutor did in this case is far worse than what happened in Caldwell. Thank you. Okay, thank you counsel Mr. Burke and Mr. Kriegel. Appreciate your arguments this afternoon and I want to thank you Mr. Burke, your co-counsel for taking this case under the Criminal Justice Act. It's a real service to the public and certainly to Mr. Willoughby and your service is appreciated.